# United States Court of Appeals
## For the First Circuit

No. 21-1719

NORTHEAST PATIENTS GROUP, d/b/a Wellness Connection of Maine;
HIGH STREET CAPITAL PARTNERS, LLC,

Plaintiffs, Appellees,

v.

UNITED CANNABIS PATIENTS AND CAREGIVERS OF MAINE,

Intervenor-Defendant, Appellant,

MAINE DEPARTMENT OF ADMINISTRATIVE AND FINANCIAL SERVICES;
KIRSTEN FIGUEROA, Commissioner of the Maine Department of
Administrative and Financial Services,

Defendants.

No. 21-1759

NORTHEAST PATIENTS GROUP, d/b/a Wellness Connection of Maine;
HIGH STREET CAPITAL PARTNERS, LLC,

Plaintiffs, Appellees,

v.

KIRSTEN FIGUEROA, Commissioner of the Maine Department of
Administrative and Financial Services,

Defendant, Appellant,

MAINE DEPARTMENT OF ADMINISTRATIVE AND FINANCIAL SERVICES;
UNITED CANNABIS PATIENTS AND CAREGIVERS OF MAINE,

Defendants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Nancy Torresen, U.S. District Judge]

Before

Barron, Chief Judge,
Lynch and Gelpí, Circuit Judges.

Matthew Warner, with whom Jonathan Mermin, Alexandra Harriman, and Preti, Flaherty, Beliveau & Pachios, LLP were on brief, for appellees.
James G. Monteleone, with whom Bernstein Shur was on brief, for appellant United Cannabis Patients and Caregivers of Maine.
Christopher C. Taub, Chief Deputy Attorney General of Maine, with whom Aaron M. Frey, Attorney General of Maine, Thomas A. Knowlton, Deputy Attorney General of Maine, and Paul E. Suitter, Assistant Attorney General of Maine, were on brief, for appellant Kirsten Figueroa.

August 17, 2022

BARRON, **Chief Judge**. This appeal concerns whether the Maine Medical Use of Marijuana Act, 22 M.R.S. §§ 2421-2430 (2009) ("Maine Medical Marijuana Act"), violates what is known as the dormant Commerce Clause of the United States Constitution by requiring "officers" and "directors" of medical marijuana "dispensar[ies]," id. § 2428(6)(H), operating in Maine to be Maine residents. The United States District Court for the District of Maine held that Maine Medical Marijuana Act's residency requirement does violate the dormant Commerce Clause, notwithstanding that Congress enacted the Controlled Substances Act ("CSA"), 21 U.S.C. § 801 et seq., to "eradicate the market" in marijuana, see Gonzalez v. Raich, 545 U.S. 1, 19 n.29 (2005). The District Court concluded that is so, because the residency requirement is a facially protectionist state regulation of an interstate market in medical marijuana that continues to operate even in the face of the CSA. We affirm.

## I.

Maine enacted the Maine Medical Marijuana Act in 2009 to authorize participation in the market in medical marijuana in that state in specified circumstances. See Maine Medical Use of Marijuana Act, 22 M.R.S. §§ 2421-2430 (2009) (the "Medical Marijuana Act") (permitting the "acquisition, possession, cultivation, manufacture, use, delivery, transfer or transportation of marijuana" relating to prescribed treatments for

- 3 -

certain medical conditions). Among other things, the Maine Medical Marijuana Act provides that a "dispensary" may sell medical marijuana in the state, so long as certain requirements are satisfied. Id. It then goes on to define a "dispensary" as "an entity registered under [22 M.R.S. § 2425-A] that acquires, possesses, cultivates, manufactures, delivers, transfers, transports, sells, supplies or dispenses marijuana plants or harvested marijuana or related supplies and educational materials to qualifying patients and the caregivers of those patients." Id. § 2422(6).

The residency requirement that is at issue in this appeal appears in § 2428(6)(H) of the Maine Medical Marijuana Act. It provides that, for a "dispensary" to be authorized under state law to sell "medical marijuana" in Maine, "all [the] officers or directors of a dispensary must be residents of [Maine]." Id. § 2422(6)(H) (the "residency requirement"). The phrase "[o]fficer or director" is then defined broadly in a separate provision of the Maine Medical Marijuana Act to include "a director, manager, shareholder, board member, partner, or other person holding a management position or ownership interest in the organization." Id. § 2422(6-B).

Northeast Patients Group is a corporation that is wholly owned by three Maine residents and that owns and operates three of Maine's seven licensed dispensaries as a for-profit corporation.

- 4 -

High Street Capital is a Delaware corporation that is owned exclusively by non-Maine residents and that wants to acquire Northeast Patients Group.  If the deal between the two companies were to proceed, as both High Street Capital and Northeast Patients Group desire, then the resulting company would not be able to function as a dispensary under Maine law in consequence of the Maine Medical Marijuana Act's residency requirement, because the "officers or directors" of that new company would not be only Maine residents.

Northeast Patients Group and High Street Capital ("plaintiffs") filed this suit under 42 U.S.C § 1983 and 28 U.S.C. § 2201 against the Maine Department of Administrative and Financial Services ("the Department") and Kirsten Figueroa, the Commissioner of the Department, on December 17, 2020, in the District of Maine to challenge the Maine Medical Marijuana Act's residency requirement.  The complaint alleges that the residency requirement violates the dormant Commerce Clause by permitting only in-staters to serve as "officers or directors" of "dispensaries."

Figueroa and the Department answered the complaint on January 29, 2021.  Shortly thereafter, United Cannabis Patients, a nonprofit advocacy group that represents medical marijuana businesses owned by Maine residents, moved to intervene in the

action as a defendant under Federal Rule of Civil Procedure 24(a)(2). The District Court granted the motion on March 23, 2021.

The parties filed a stipulated record that same month, and the plaintiffs moved for summary judgment on that record. Figueroa and the Department cross-moved for summary judgment on the record on April 26, 2021. United Cannabis Patients opposed the plaintiffs' motion that same day.

The District Court ruled on the parties' motions on August 11, 2021. The District Court granted judgment for the Department on the ground that the Department was immune from suit under the Eleventh Amendment to the U.S. Constitution. Ne. Patients Grp. v. Maine Dep't of Admin. & Fin. Servs., 554 F. Supp. 3d 177, 181-82 (D. Me. 2021). The District Court held with respect to the plaintiffs' claims against Figueroa that Maine's residency requirement violated the dormant Commerce Clause. On that basis, it granted the plaintiffs' motion for a permanent injunction and enjoined Figueroa from enforcing Maine's residency requirement. Id. at 185. It also denied the defendants' motion for judgment on the stipulated record on the same basis. Id.

Figueroa and United Cannabis Patients timely appealed. They simultaneously moved for the District Court to stay its injunction while the appeal was pending. On October 27, 2021, the District Court granted the motion and stayed the injunction. This appeal followed.

- 6 -

The Commerce Clause of the U.S. Constitution provides that "Congress shall have [the] [p]ower . . . [t]o regulate Commerce . . . among the several States." U.S. Const. Art. I, § 8, cl. 3. The Supreme Court of the United States has long construed the Commerce Clause to be not only an affirmative grant of authority to Congress to regulate interstate commerce but also a negative, "self-executing limitation on the power of the [s]tates to enact laws [that place] substantial burdens on [interstate] commerce." S.-Cent. Timber Dev., Inc. v. Wunnicke, 467 U.S. 82, 87 (1984); see also Gen. Motors Corp. v. Tracy, 519 U.S. 278, 287 (1997) ("The negative or dormant implication of the Commerce Clause prohibits state taxation or regulation that discriminates against or unduly burdens interstate commerce and thereby 'imped[es] free private trade in the national marketplace.'" (internal citations omitted) (alteration in original) (quoting Reeves, Inc. v. Stake, 447 U.S. 429, 437 (1980))). Thus, the negative aspect of the Commerce Clause in and of itself protects interstate commerce from "the evils of 'economic isolation' and protectionism" that state regulation otherwise could bring about. City of Philadelphia v. New Jersey, 437 U.S. 617, 624 (1978).

The District Court concluded in this case that the "dormant implication of the Commerce Clause" prohibits Maine's residency requirement from being given legal effect. The

defendants do not dispute that Maine's residency requirement, if applied to a lawful market, would comport with the dormant Commerce Clause (as the Clause's negative aspect is often called) only if that requirement were "narrowly tailored to 'advanc[e] a legitimate local purpose,'" Tenn. Wine and Spirits Retailers Assoc. v. Thomas, 139 S. Ct. 2449, 2461 (2019) (quoting Dep't of Revenue of Ky. v. Davis, 553 U.S. 328, 338 (2008)). The defendants also do not dispute that, at least with respect to a lawful market, "where simple economic protectionism is effected by state legislation, a virtually per se rule of invalidity has been erected." City of Philadelphia, 437 U.S. at 624. Finally, the defendants do not dispute that they cannot show that Maine's residency requirement, if it were applied to a lawful market, would be narrowly tailored to serve a legitimate local purpose, because they agree that, as applied to such a market, the requirement would "basically [be] a protectionist measure," id. at 624, that would both "discriminate[] against" and "unduly burden[] interstate commerce," Gen. Motors Corp., 519 U.S. at 287.

The defendants' acceptance of these propositions should come as no surprise, given the Maine Medical Marijuana Act's sweeping definition of "officers" and "directors." In Tennessee Wine and Spirits Retailers Association v. Thomas, the Supreme Court found the state law at issue there to be "plainly based on unalloyed protectionism," 139 S. Ct. 2449, 2474 (2019), and so

- 8 -

barred by the dormant Commerce Clause, because the measure required all the stockholders of a corporation holding a license to operate an in-state liquor store to be state residents, id. at 2456. Maine's measure goes ever further in discriminating against out-of-staters, as a plain reading of the definition of "officers or directors" in the Medical Marijuana Act would seem to sweep up anyone with the title of "manager," no matter at what level, as well as all stockholders and anyone with an ownership interest of any amount. See 22 M.R.S. § 2422(6-B).

That the defendants do not dispute these points does not mean, however, that they accept that the dormant Commerce Clause bars the residency requirement. They argue that, notwithstanding these points, Maine's residency requirement comports with the dormant Commerce Clause because federal law makes participation in the market to which the residency requirement applies illegal. It is that contention -- and that contention alone -- that we must address.

It is important to emphasize at the outset, however, that, to address that contention, we need to examine the distinct versions of it that the defendants press. As we will see, each version rests on its own, independent premises. We thus proceed accordingly, starting with the defendants' most sweeping version. We then work our way through to the most case-specific -- but, as we will explain -- still unpersuasive one. Our review, in all

events, is de novo, see Walgreen Co. v. Rullan, 405 F.3d 50, 55 (1st Cir. 2005).

## A.

The defendants' first ground for contending that the District Court erred in ruling that the residency requirement violates the dormant Commerce Clause rests on the uncontroversial major premise that the dormant Commerce Clause only "denies the [s]tates the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." Or. Waste Sys., Inc. v. Dep't of Env't Quality of Or., 511 U.S. 93, 98 (1994). This ground also appears to rest, however, on a minor premise -- namely, that it is impossible for there to be an interstate market in any good that, under federal law, is contraband throughout the country.

The defendants appear to be relying on this minor premise because they contend that the CSA ensures that the residency requirement does not run afoul of the dormant Commerce Clause simply because that federal statute, by making marijuana contraband, ensures that there is no interstate market in commerce for the residency requirement to burden. But, the minor premise is mistaken.

That is not just because it is possible for an interstate commercial market in contraband to exist, as the persistence of interstate black markets of various kinds all too clearly

- 10 -

demonstrates.  It is also because the Supreme Court has recognized as much in connection with its review of Congress's attempt to exercise the Commerce Clause's affirmative grant of power to stamp out the interstate market in marijuana.

Specifically, in Gonzalez, the Supreme Court considered whether Congress had the authority under the Commerce Clause to "prohibit the local cultivation and use of marijuana" even when undertaken in compliance with state law, 545 U.S. at 5.  The Court explained that Congress did possess such authority -- and thus that the CSA constituted a proper exercise of the commerce power insofar as that federal statute effected such a prohibition -- in part because marijuana is a "fungible commodity for which there is an established, albeit illegal, interstate market."  Id. at 18 (emphasis added).

We note, too, that nothing in the record in this case indicates that, due to the CSA, there is no interstate market in medical marijuana.  The prohibition that Maine's Medical Marijuana Act seeks to impose on out-of-state actors entering that very market reflects the reality that the market continues to operate. That prohibition even indicates that the market is so robust that, absent the Medical Marijuana Act's residency requirement, it would be likely to attract entrants far and wide.  And, while the Medical Marijuana Act does attempt to restrict out-of-staters from selling medical marijuana, it affirmatively encourages out-of-staters to

participate in the medical marijuana market as customers. See 22 M.R.S. § 2423-D (permitting a "visiting qualifying patient from another jurisdiction that authorizes the medical use of marijuana" to possess limited quantities of marijuana in Maine).

Congress's enactment of the Rohrabacher-Farr Amendment in the wake of the CSA's passage further undermines the notion that no such interstate market exists. That amendment hardly reflects a congressional understanding that the CSA succeeded in eradicating the interstate market in medical marijuana. See Consolidated Appropriations Act of 2022, Pub. L. No. 117-103, § 531, 136 Stat. 49 (2022) (providing that "[n]one of the funds made available under this Act to the Department of Justice may be used, with respect to [Maine and other states], to prevent any of them from implementing their own laws that authorize the use, distribution, possession, or cultivation of medical marijuana"). And, we note, the current Rohrabacher-Farr Amendment is no anomaly, as Congress has included an identical version of it in every annual congressional appropriation to the U.S. Department of Justice since fiscal year 2015, see United States v. Bilodeau, 24 F.4th 705, 709 (1st Cir. 2022), reflecting the fact that over time more than half of all states have legalized the market for medical marijuana to some extent.

We make one additional observation. The defendants acknowledged at oral argument that Congress could enact a measure

pursuant to the Commerce Clause to preempt the residency requirement that the Medical Marijuana Act imposes. Thus, the defendants do not dispute that Congress could exercise the commerce power to countermand Maine's protectionist choice to afford only its residents the chance to exploit the market in question by operating a medical marijuana dispensary in that state. But, in consequence, the defendants necessarily recognize that an interstate commercial market in medical marijuana must exist that the Commerce Clause can reach. Thus, the defendants themselves appear, in the end, to be less committed to the view that there is no interstate market in medical marijuana than their lead ground for challenging the District Court's ruling might suggest.

**B.**

The defendants next contend, somewhat more modestly, that the District Court's ruling cannot stand even if there is an interstate market in medical marijuana that continues to operate in the face of the CSA. Here, the defendants shift away from the contention that there is no such market for the dormant Commerce Clause to protect. They appear to contend instead that the negative implication of the Commerce Clause is a nullity with respect to the interstate market in medical marijuana simply because Congress affirmatively exercised its Commerce Clause power to regulate that very market. But, insofar as that is what the defendants mean to argue, we are not persuaded. Or, at least, we

- 13 -

are not, given the nature of the specific federal legislative context in which this case arises.

To see why, it is important to keep in mind that the question before us is not whether the CSA preempts the residency requirement in the Medical Marijuana Act. It is whether the residency requirement cannot stand because it transgresses the dormant Commerce Clause due to the substantial burden that this requirement (in light of its patently protectionist nature) imposes on interstate commerce.

This distinction matters because preemption by a federal statute and prohibition by the dormant Commerce Clause are distinct rather than coterminous means by which federal law may limit state lawmaking that substantially burdens interstate commerce. Thus, the negative implication of the commerce power may pose an independent bar to a state regulation of an interstate commercial market even when Congress chooses to exercise its affirmative commerce power with respect to that same market without also preempting that state regulation.

Precedent accords with this same understanding. The Supreme Court addressed whether the negative implication of the commerce power bars a state regulation of commercial activity in the same interstate market in which Congress has exercised its affirmative commerce power in California v. Zook, 336 U.S. 725 (1949). In doing so, the Court examined whether the federal

statute that resulted from Congress's exercise of that power preempted the state law at issue while also, separately, determining whether the state law comported with the requirements of the dormant Commerce Clause.  Id. at 725.

Moreover, our own decision in United Egg Producers v. Department of Agriculture of Puerto Rico, 77 F.3d 567 (1st Cir. 1996), accords with this understanding of the way that the affirmative and negative aspects of the Commerce Clause relate to one another.  There, we considered whether a Puerto Rico law that mandated that eggs sold within the Commonwealth be stamped with the two-letter code that indicated their state of origin violated the dormant Commerce Clause.  Id. at 569.  We held that it did, even though Congress had already regulated the labeling of eggs within the continental United States.  Id. at 507.  We thus did not treat Congress's exercise of the Commerce Clause's affirmative grant of power in the interstate market in eggs as having inherently displaced the operation of the Commerce Clause's negative implication on state attempts to regulate that market. Rather, we concluded that the dormant Commerce Clause operated as an independent means by which federal law could limit a state law attempt to regulate the interstate commercial market that the federal statute did not itself preempt.

To be sure, unlike the federal statute at issue in United Egg Producers, the CSA applies uniformly throughout the United

States.  But, as we have noted, the defendants do not suggest that the CSA preempts the provision of the Medical Marijuana Act that is at issue.  Nor could they press their appeal if they did.  That being so, this case is no different from United Egg Producers when it comes to the question of whether the fact that Congress has regulated an interstate market to some extent in and of itself renders the dormant Commerce Clause inoperative as to any state regulation of that same market.

Simply put, here, as there, the state is attempting to regulate an interstate market in a way that no federal statute on its own purports to prohibit.  Cf. Tenn. Wine, 139 S. Ct. at 2465 (noting that "[d]ormant Commerce Clause restrictions apply only when Congress has not exercised its Commerce Clause power to regulate the matter at issue," and citing to Leisy v. Hardin, 12 Ky. L. Rptr. 167 (1890), which discusses federal preemption of state law (emphasis added)).  And so, here, as there, the question remains whether a separate possible federal law bar to such state regulation -- namely, the dormant Commerce Clause -- stands in the way.

Nonetheless, we need not -- and so, do not -- hold that a congressional exercise of the commerce power can never, merely by being in place, displace the dormant Commerce Clause.  As we have noted above, the CSA was not Congress's last word on the market in marijuana.  Rather, some years after Congress passed the

CSA, Congress enacted the Rohrabacher-Farr Amendment. And, it has continued to enact that measure annually thereafter.

This congressional action in the wake of the CSA reflects that Congress contemplates both that an interstate market in medical marijuana may exist that is free from federal criminal enforcement and that, if so, this interstate market may be subject to state regulation. Thus, this is not a case in which, if Congress is our guide, we have reason to conclude solely based on Congress's affirmative exercise of its commerce power with respect to an interstate market either that there is nothing left of that market for the dormant Commerce Clause to protect from state protectionism or that there is no prospect of states attempting to substantially burden that market through protectionist regulation. Accordingly, this is not a case in which we could conclude from the fact of congressional regulation of the relevant interstate market alone -- and thus without further inquiry into congressional intent in so regulating that market -- that the dormant Commerce Clause imposes no limits on state regulation of the interstate market, including even when such state regulation smacks of pure protectionism.

In arguing otherwise, the defendants do invoke an out-of-state precedent, Pic-A-State PA, Inc. v. Commonwealth of Pennsylvania, 42 F.3d 175 (3d Cir. 1994). There, the Third Circuit considered the validity of a state statute that prohibited the

- 17 -

sale of out-of-state lottery tickets in the face of a federal statute that barred interstate sales of lottery tickets.  Id. at 179.  Pic-A-State held that the state regulation was not barred by federal law.  Id. at 178-80.

The Third Circuit stated in reaching that conclusion that where Congress "proscribe[s] certain interstate commerce, Congress has determine[d] that . . . commerce is not in the national interest."  Id. at 179.  The Third Circuit then went on to state that, "where such a determination has been made by Congress, it does not offend the purpose of the Commerce Clause for states to discriminate or burden that commerce."  Id.

But, we do not understand the Third Circuit to have premised its decision to uphold the state law in that case on the mere fact that Congress had exercised its affirmative commerce power to regulate the same interstate market that the state law burdened.  The Third Circuit rested its holding on the more fine-grained determination that the state statute that was claimed to violate federal law "[was] consistent with the federal criminal proscription," id. at 180 (emphasis added), such that the state law, regardless of its possibly protectionist nature, "did not offend the purpose of the Commerce Clause," id. at 179.  And, in explaining why the state and federal measures at issue were properly deemed to be "consistent," Pic-A-State emphasized that the state law, by mirroring the federal one, "aided" Congress's

objectives.  Id. at 180.  Pic-A-State, therefore, does not hold that a congressional decision to regulate an interstate market in and of itself pretermits an inquiry into whether a state law violates the dormant Commerce Clause by substantially burdening that very market.  Pic-a-State holds only, like Zook, that, in some circumstances, a federal statute may provide a basis for concluding that a state law that otherwise might run afoul of the dormant Commerce Clause does not.

## C.

The defendants make one last stand.  They contend that the dormant Commerce Clause does not bar Maine's residency requirement because Congress "consent[ed] to [this] otherwise impermissible state regulation," United Egg Producers, 77 F.3d at 570, through the CSA.  This version of the defendants' challenge to the ruling below is unlike the others that we have considered thus far, because it turns entirely on whether Congress intended in the CSA to bless state attempts to substantially burden the interstate market in medical marijuana.

The defendants are, of course, correct that Congress could manifest an intent to consent to Maine's chosen means of substantially burdening that market.  The defendants also are correct that if Congress were to manifest such an intent, then the dormant Commerce Clause would pose no bar to the residency requirement.  It is well established that "Congress may 'redefine

- 19 -

the distribution of power over interstate commerce'" by consenting to state laws that would otherwise violate the dormant Commerce Clause. S.-Cent. Timber, 467 U.S. at 87–88 (quoting S. Pac. Co. v. Arizona, 325 U.S. 761, 769 (1945)). As we will explain, however, we cannot conclude that Congress did manifest such an intent through the CSA.

### 1.

Ordinarily, Congress must "expressly state" an intent to obviate the dormant Commerce Clause's limitation on protectionist state regulation. Sporhase v. Nebraska, ex rel. Douglas, 458 U.S. 941, 960 (1982) (quoting New England Power Co. v. New Hampshire, 455 U.S. 331, 343 (1982)); Prudential Ins. Co. v. Benjamin, 328 U.S. 408, 427 (1946) (same). The usual requirement that Congress must be "unmistakably clear," S.-Cent. Timber, 467 U.S. at 91, about its "intent and policy to sustain state legislation from attack under the Commerce Clause," Sporhase, 458 U.S. at 960 (quoting New England Power, 455 U.S. at 343 (internal quotation marks omitted)), "is mandated by the policies underlying dormant Commerce Clause doctrine." S.-Cent. Timber, 467 U.S. at 91-92.

The dissent points out that none of the cases that apply this clear statement requirement concern a state measure that had been imposed on an interstate commercial market that Congress had sought to snuff out. The dissent goes on to contend that, because Congress has sought to criminalize the market at issue in this

case through the CSA, there is no reason to apply the clear statement requirement here.  See Dissent at 38-39.

To support this conclusion, the dissent stresses that the policy underlying the dormant Commerce Clause is to preserve a "national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors."  Gen. Motors, 519 U.S. at 299.  It asserts as well that, when such a national market for competition is maintained, "every consumer may look to the free competition from every producing area in the Nation to protect him from exploitation by any."  Id. at 299-300 (quoting H.P. Hood & Sons, Inc. v. Du Mond, 336 U.S. 525, 539 (1949)).  See Dissent at 40. The dissent then contends that there is no reason to require Congress to make a clear statement blessing state protectionism when Congress does not want any consumers to be participating in the relevant market. Indeed, the dissent suggests that it would be anomalous to expect Congress to articulate such mixed messages clearly.  See Dissent at 41.

But, we are not as confident that the constitutionally rooted rule of construction that ordinarily applies is categorically inapplicable when Congress seeks to eradicate a national market through a federal criminal statute (even assuming that was Congress's intent in enacting the CSA and that, the Rohrabacher-Farr Amendment notwithstanding, Congress continues to

- 21 -

have that intent). Indeed, in South-Central Timber Development, Inc. v. Wunnicke, 467 U.S. 82 (1984), the Supreme Court described at some length the logic that underlies the clear statement requirement, and it is not evident to us that this logic supports the view that there is no such requirement whenever Congress has acted to make a certain kind of interstate commercial activity unlawful.

The Court explained in South-Central Timber that the democratic process at the state level does not in and of itself function as an effective restraint against protectionist state laws because the burdens that such laws impose will fall on actors who are unrepresented in state legislatures. Id. at 92; see also S.C. State Highway Dep't. v. Barnwell Bros., Inc., 303 U.S. 177, 185 n.2 (1938) ("[W]hen the regulation is of such a character that its burden falls principally upon those without the state, legislative action is not likely to be subjected to those political restraints which are normally exerted on legislation where it affects adversely some interests within the state."). The Court further observed that, by contrast, "when Congress acts, all segments of the country are represented, and there is significantly less danger that one State will be in a position to exploit others." S.-Cent. Timber, 467 U.S. at 92. And, the Court noted, when a state is in such an advantageous position relative to other states and we can be confident that Congress has authorized that

state to capitalize on the edge that it holds, we at least know that "the decision to allow [that state to so capitalize] is a collective one." Id. Thus, the Court explained, "[a] rule requiring a clear expression of approval by Congress ensures that there is, in fact, such a collective decision and reduces significantly the risk that unrepresented interests will be adversely affected." Id.

To be sure, South-Central Timber is itself a case in which the interstate market at issue was a lawful one to enter. And, we do not dispute that the potential for protectionist state regulation to stoke antagonism among the states is likely to be greatest when the market at issue is a lawful one. The incentives for states to let their rivalries get the best of them are clear in that circumstance, given the reasons to think that a lawful market is inherently ripe to be exploited.

But, we are not as confident as the dissent that interstate rivalry in the commercial realm poses no risk to our national system of government whenever the commercial market at issue is one that federal law makes illegal. Indeed, the issue of whether Congress has chosen to bless a state's effort to protect such a market for its own residents will only arise when a state does have an incentive to exploit it, as that issue presents itself only when a state seeks to regulate an illegal market through protectionist means. There thus appear to us to be reasons to be

concerned that states sometimes will act on those incentives to the detriment of the national system of government even in a market of that illegal kind.

To be sure, we may expect that, with respect to markets in which Congress makes participation a crime, states will not take the unusual steps that many states have taken with respect to medical marijuana in seeking to facilitate participation in it. And, of course, if states take no such steps, then we will have no occasion to inquire into whether Congress has blessed state protectionism, clearly or otherwise. But, when states do take such steps, and in taking them enact protectionist measures, we have no choice but to decide whether to so inquire and, if an inquiry is required, to decide how demanding that inquiry must be.

In answering those questions, we do not see how we may simply ignore the suggestion from history that we have some obligation to be attentive to the dangers that state protectionism poses to the federal system of government that the Constitution establishes. The destructive consequences of allowing states to exercise an unfettered power to discriminate against each other's industry have been of great concern since the Founding. Indeed, "[r]emoving state trade barriers was a principal reason for the adoption of the Constitution," Tenn. Wine, 139 S. Ct. at 2460, and not solely because their removal would benefit consumers. As Alexander Hamilton cautioned in Federalist Paper No. 7:

The competitions of commerce would be another fruitful source of contention. The States less favorably circumstanced would be desirous of escaping from the disadvantages of local situation, and of sharing in the advantages of their more fortunate neighbors. Each State, or separate confederacy, would pursue a system of commercial policy peculiar to itself. This would occasion distinctions, preferences, and exclusions, which would beget discontent. . . . The infractions of these regulations, on one side, the efforts to prevent and repel them, on the other, would naturally lead to outrages, and these to reprisals and wars.

We are thus reluctant, given such Founding-era worries, to construe the negative aspect of the dormant Commerce Clause in a way that would essentially require us to ignore the potential for a trade war to be destructive whenever its genesis could be traced to a single state's effort to attain predominance in a market that federal law deems unlawful. The potential for any trade war -- including one started in that way -- to escalate and have knock-on effects would seem rather strongly to counsel against our doing so.

Accordingly, we are skeptical that the precedents in this area may be read to show that, whenever Congress makes participation in an interstate market unlawful, Congress need not be as clear in blessing state protectionism as we usually demand that it must be. Certainly, no case so holds.

Our skepticism in this regard, however, is especially great here. As we have emphasized, Congress, through the

Rohrabacher-Farr Amendment, has acknowledged the existence of a market in medical marijuana. It has also acknowledged, through that same measure, that this market may continue to exist in some circumstances free from federal criminal enforcement and thus subject only to state regulation. See Bilodeau, 24 F.4th at 709. And, of course, it has done so in the wake of the unusual efforts by many states (Maine included) to construct a legal framework for lawful participation -- as a matter of state law -- in that very same market.

Thus, whatever the circumstances may be with respect to other goods that Congress has deemed contraband, this is not a case in which Congress may be understood to have criminalized a national market with no expectation that an interstate market would continue to operate. Quite the opposite. Congress has taken affirmative steps to thwart efforts by federal law enforcement to shut down that very market, through the annual enactment of the Rohrabacher-Farr Amendment. And it has taken those steps, presumably, with an awareness of the beneficial consequences that those steps will have for consumers who seek to obtain medical marijuana.

For that reason, whatever assumptions may be warranted in other contexts, we have trouble seeing why we must assume here that the specter of states competing for dominance in this market through protectionist means is so remote that we need not demand

that Congress make a point of expressly consenting to their doing so.  Congress itself has given us reason to attend to that very specter by so plainly contemplating state regulation of this market.

How, then, would the defendants' claim of congressional consent fare here if the clear statement requirement were to obtain?  Not well, we think.

Nothing on the face of the CSA purports to bless interstate discrimination in the market for medical marijuana. The CSA in that respect stands in stark contrast to notable instances of Congress blessing such interstate discrimination. See, e.g., Prudential Ins. Co. v. Benjamin, 328 U.S. 408 (1946) (finding that Congress's purpose in enacting the McCarran Act "was broadly to give support to the existing and future state systems for regulating and taxing the business of insurance . . . by removing obstructions which might be thought to flow from its own power, whether dormant or exercised, except as otherwise expressly provided in the Act").  The same may be said of the Rohrabacher-Farr Amendment.

Perhaps for these reasons, neither the dissent nor the defendants attempt to argue that Congress's expression of consent to this kind of rank protectionism is unmistakably clear.  They offer only reasons for us not to require that Congress express its intent to give such consent with that kind of clarity.

All that said, we need not -- and so, do not -- go so far as to hold that the same clear statement requirement that obtains when a market is lawful necessarily obtains even when a market is not. We choose to take what seems to us a more prudent course, by assuming that the dissent is right that this clear statement requirement does not apply here. For, as we will next explain, even if there is reason to excuse Congress for not attending to the possibility that states might seek to protect their ability to exploit a market in which participation is a federal crime, we still cannot conclude that Congress has consented to the kind of state protectionism in which Maine has engaged.

**2.**

To conclude that Congress has consented to such protectionism, we would have to do more than abandon the ordinary rule that Congress does not mean to consent to such measures unless it does so in unmistakably clear terms. We would have to adopt the presumption that Congress does mean to consent to such measures whenever it makes participation in an interstate market a crime. And that is because, absent the application of such a pro-protectionism presumption, we see nothing in this record that could support the conclusion that Congress did mean to bless such protectionist measures here.

To that point, it can hardly be said that a state effort to protect a market in medical marijuana from out-of-state

competition necessarily advances Congress's evident goal in the CSA of preventing entry into that market. Such protectionism does, of course, stop out-of-staters from entering the market. But, it does so only by simultaneously insulating in-state actors who do choose to enter that market from competition. It thus threatens, in the way that protectionist measures necessarily do, to encourage precisely what the CSA seeks to stop -- trade by in-staters in the relevant market. Indeed, if that were not Maine's aim in imposing the residency requirement, then why would Maine not have simply prohibited dispensaries altogether, rather than protected those run by Mainers from outside competition? For these reasons, we conclude that, while Maine's residency requirement does limit some actors from trading in medical marijuana, it does so in a way that, due to its protectionist nature, in no sense "aid[s]" the policy expressed by Congress in the CSA, Pic-A-State, 42 F.3d at 180.

Moreover, Congress took the time in the Rohrabacher-Farr Amendment to address the extent to which, the CSA notwithstanding, the market in medical marijuana may be protected from federal prosecutorial action. But, the defendants do not suggest that, in doing so, Congress said anything that would indicate that it intends to bless the kind of protectionist regulation of that market by a state that the dormant Commerce Clause would bar in a lawful market.

The defendants' failure to do so is understandable. The Rohrabacher-Farr Amendment does not in fact repeal the CSA as to medical marijuana. It is thus hard to discern from the Rohrabacher-Farr Amendment a congressional intent to bless a state regulation of the market that might further participation in it, such as a protectionist state law like the one at issue here might. Yet, at the same time, the Rohrabacher-Farr Amendment does plainly reflect an effort by Congress to free the market in medical marijuana from being subject to the full degree of federal criminal enforcement to which that market otherwise would be subject. And yet, the Rohrabacher-Farr Amendment does so without in any way indicating that Congress wishes for that interstate commercial market to be the unusual one that states may substantially burden through protectionist measures.

So, to the extent that the Rohrabacher-Farr Amendment bears on the inquiry into whether Congress intended to bless such protectionist state regulation, that federal measure at most adds to our reasons for concluding that Congress did not. And that is because that federal measure reflects Congress's awareness of there being a market in medical marijuana but contains not a word that would suggest, even by implication, that states may substantially burden it.[1]

---

[1] In this regard, we note that unlike the prohibition in Ne. Bancorp, Inc. v. Bd. of Governors of Fed. Rsrv. Sys., 472 U.S.

- 30 -

To make the case that, even if Congress's affirmative regulation of the marijuana market does not in and of itself displace the dormant Commerce Clause, Congress nonetheless has consented to the protectionism in which Maine has engaged, the defendants do appear to rely on Pic-A-State once again. But, that precedent, once again, offers the defendants no support.

The Third Circuit observed in upholding the state law measure in that case that the Supreme Court has explained that federal preemption and dormant Commerce Clause doctrines are "separate particularizations of [the] principle" that Congress -- not the states -- holds the power to "redefine" areas of national policy. Pic-A-State, 42 F.3d at 180 (quoting Zook, 336 U.S. at 733). Moreover, the federal statute in that case made it a crime to participate in an interstate lottery market and the state law at issue mirrored that same federal criminal prohibition. Thus, the Third Circuit had no trouble concluding that the state law did not run afoul of "national policy," id. at 179, because that state

_____

159, 163 (1985) (describing the Douglas Amendment, which "prohibits the Board from approving an application of a bank holding company or bank located in one State to acquire a bank located in another State, or substantially all of its assets, unless the acquisition 'is specifically authorized by the statute laws of the State in which such bank is located, by language to that effect and not merely by implication'" (quoting 12 U.S.C. § 1842(d) (1985))), which makes explicit reference to interstate protectionism, the CSA makes no much explicit reference.

law had the effect of "aiding" the same federal proscription, id. at 180.

Here, by contrast, the federal criminal prohibition that the CSA imposes is, as we have explained, not "aided" in any evident way by the ban on out-of-state participation in the market in medical marijuana in Maine. To the contrary, that state law ban encourages participation in that market (at least by in-staters) that the CSA gives every indication that Congress seeks to prevent.

True, as we have noted, the Rohrabacher-Farr Amendment does limit enforcement of the national ban on participation in that market that the CSA imposes. But, as we have pointed out, the defendants understandably do not suggest that Congress blessed Maine's protectionism through the Rohrabacher-Farr Amendment.

Thus, we see no basis for concluding in this case that Congress intended to permit state discrimination against out-of-staters in the interstate market in medical marijuana, unless there is a presumption that Congress means to consent to state protectionism whenever it exercises its commerce power to make participation in an interstate market unlawful. But, we know of no precedent that would support the application of such a pro-protectionism presumption.

Nor can we think of any logic, set forth in the available precedent, that would lead us to apply that presumption. Indeed,

applying that presumption would seem only to invite state attempts to exploit markets that Congress has made illegal, by freeing states to regulate those markets in ways that would facilitate only their residents' participation in them. Thus, as neither the defendants nor the dissent have given us any reason to adopt the presumption, we reject the defendants' third and final ground for concluding that the Maine residency requirement does not violate the dormant Commerce Clause, just as we have rejected each of the other two that the defendants have put forward.

**III.**

We close by addressing what appears to us to be the dissent's two additional grounds for reversing the District Court, though neither appears to be a ground on which the defendants themselves rely. We are not persuaded by either one.

The first of these grounds is that a court has no warrant to "extend" the reach of the Commerce Clause's negative implication to a market in goods that is "illegal." As the dissent puts it, "[n]othing in our precedents asserts a 'fundamental' constitutional interest in 'preserving a national market for competition in a market which Congress has lawfully proscribed." (quoting Gen. Motors Corp., 519 U.S. at 299). See Dissent at 42.

But, of course, what is merely an application of the dormant Commerce Clause to a new circumstance and what is an extension of the dormant Commerce Clause beyond its permissible

- 33 -

bounds is the issue at hand.  Indeed, it would be just as well to say that we have no warrant to limit the scope of the dormant Commerce Clause in these unique circumstances just because the CSA is on the books.

Why, then, would it be improper for us to apply the dormant Commerce Clause here?  There is an interstate market, and a state is trying to protect its advantageous position with respect to it.  Moreover, Congress anticipated both that there would be such a market, despite having passed the CSA, and that states would seek to regulate it.  So, given the long-held understanding that the dormant Commerce Clause has a negative aspect, there would seem to be no basis for our declining to enforce the dormant Commerce Clause unless there were a reason for us to think that Congress had exercised its commerce power in a way that would suggest that we should not do so.  Yet, as we have explained, we have no reason to think that Congress has.

In so concluding, we again find support in the Supreme Court's decision in Zook.  There, the Court considered a challenge to a state law that criminalized "sale or arrangement of any transportation over public highways of [that] State if the transporting carrier" did not have the proper permit could stand, notwithstanding a federal law that was "substantially the same." Id. at 726.  The Court ultimately concluded that the state law aided the enforcement of the federal criminal prohibition that

Congress had enacted, and, in doing so, it appeared to conclude that Congress had blessed the protectionist policy, such that it was neither preempted nor violative of the dormant Commerce Clause. Id. at 731. In doing so, the Court in no way suggested that because a federal statute makes the relevant interstate commercial activity illegal, states are free to regulate that activity in ways that the dormant Commerce Clause otherwise would bar without there being any indication that Congress had consented to states doing so. The Court held only that, notwithstanding the dormant Commerce Clause, states could so regulate the interstate commercial activity that Congress had made illegal when Congress had not preempted state efforts to do so and those state efforts mirrored the precise criminal prohibition that Congress had enacted. Id.; see also Pic-A-State, 42 F.3d at 179-80 (considering whether a state statute that criminalized the participation in an interstate market was "consistent with the federal criminal proscription" as part of its analysis as to whether that state law violated the dormant Commerce Clause).

For these reasons, we cannot see how we may conclude that, whenever Congress criminalizes activity in an interstate commercial market, Congress need not give any indication of its intent to permit a state to do what it otherwise may not -- substantially burden interstate commerce without adequate

justification.  Accordingly, we cannot agree with the dissent's contrary view.

The remaining ground posited by the dissent seems to be rooted less in a claim about the reach of the dormant Commerce Clause itself than in a claim about the scope of a court's equitable power to enforce it.  The dissent asserts that the plaintiffs "should not be able to receive a constitutional remedy in federal court to protect the sale and distribution of a controlled substance which remains illegal under federal law." See Dissent at 42-43; see also Original Investments, LLC v. Oklahoma, 542 F. Supp. 3d 1230, 1233 (W.D. Okla. 2021).

But, we do not see how it would be equitable for us to leave a dormant Commerce Clause violation unremedied if such a violation has occurred.  To the extent that the dissent suggests that we must not provide a remedy for the sake of ensuring that we do not inadvertently facilitate participation in an illegal market, we do not see why.  The surest way to prevent courts from inadvertently preventing state regulation of interstate commercial markets that Congress meant to permit is to look for indications that Congress did intend to permit them.  And, insofar as the dissent means to suggest that such an indication can be found in the mere fact that Congress has made it illegal to participate in the market that a state has chosen to regulate, then it seems to us that the dissent is relying on the ground set forth above.  But,

as we there explained, we are not persuaded that the dormant Commerce Clause can have no effect in a market in which Congress has made participation criminal, including even one in which, as is the case here, Congress has barred enforcement of the federal criminal prohibition in certain respects.

## IV.

The District Court's grant of judgment on the stipulated record to the plaintiffs and denial of its grant of judgment to the defendants is **<u>affirmed</u>**.

**-Dissenting Opinion Follows-**

**GELPÍ**, **Circuit Judge, dissenting**.  I respectfully dissent from the affirmation of the district court's opinion.  I agree that Maine's residency requirement, that "[a]ll officers or directors of a dispensary must be residents of this State" set forth at 22 M.R.S. § 2428(6)(H), incontestably constitutes protectionist legislation.  Indeed, at oral argument, counsel for Defendant-Appellant Kristen Figueroa conceded as much.  Moreover, Figueroa does not assert that the measure could meet the strict scrutiny standard to which protectionist legislation is ordinarily subject.  Indeed, the Supreme Court and this court have routinely invalidated similar protectionist legislation in markets ranging from liquor store licensing to egg products.  See, e.g., Tenn. Wine & Spirits Retailers Ass'n v. Thomas, 139 S. Ct. 2449, 2457 (2019); United Egg Producers v. Dep't of Agric., 77 F.3d 567, 571-72 (1st Cir. 1996).  Following this caselaw, the majority affirms the district court by concluding that Maine's measure fails under the dormant Commerce Clause, because defendants have not satisfactorily demonstrated Congress's "unmistakably clear intent to allow otherwise discriminatory regulations," United Egg Producers, 77 F.3d at 570 (citing Wyoming v. Oklahoma, 502 U.S. 437, 458 (1992)), or demonstrated that Congress has otherwise consented to such protectionist legislation.  In the ordinary course, in an ordinary market, I would agree that such a measure

is unconstitutional under well-trodden dormant Commerce Clause principles and caselaw.

But the national market for marijuana is unlike the markets for liquor licenses or egg products in one crucial regard: it is illegal. Congress in 1971 enacted the Controlled Substance Act (CSA) pursuant to its Commerce Clause powers, designating marijuana a Schedule I controlled substance. See 21 U.S.C. § 841; id. § 812(c)(Schedule I)(c)(10); Gonzales v. Raich, 545 U.S. 1, 22 (2005). Under the CSA, it is a crime "to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a)(1). It is here that I part ways with the majority, because I disagree that the test we have developed for the mine-run of dormant Commerce Clause cases apply automatically or with equal vigor when the market in question is illegal as a matter of federal law. As such, I do not believe that the United Egg Producers test -- which, prior to today, we have only ever applied in cases involving legal markets -- extends to national markets that Congress has expressly made illegal. Instead, I start from the premise that we should vindicate the principles that animate the dormant Commerce Clause -- and I conclude that the same constitutional precepts that led us to articulate the United Egg Producers test counsel against its application here.

As the Supreme Court has stated, "the dormant Commerce Clause's fundamental objective [is to] preserve[] a national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors." Gen. Motors Corp. v. Tracy, 519 U.S. 278, 299 (1997). It follows that, in the market for legal goods and services in the stream of interstate commerce, the dormant Commerce Clause renders unconstitutional a state's preferential treatment of its residents, absent Congress's "unmistakably clear intent to allow otherwise discriminatory regulations." United Egg Producers, 77 F.3d at 570. This is because the law presumes the public interest is best served by maintaining an unencumbered "national market for competition" in legal goods and services. Gen. Motors Corp., 519 U.S. at 299. However, it makes little sense to retain this presumption when Congress has explicitly acted to make the market in question illegal, because the premise that the dormant Commerce Clause enshrines, and which undergirds United Egg Producers, does not hold. The Commerce Clause does not recognize an interest in promoting a competitive market in illegal goods or services or forestalling hypothetical interstate rivalries in the same.[2]

_____

[2] The majority highlights the Supreme Court's explanation in South-Central Timber Development, Inc. v. Wunnicke, 467 U.S. 82 (1984) that -- in the context of the lawful timber market -- "the risk that unrepresented interests will be adversely affected by restraints on commerce" informs the "policies underlying dormant Commerce Clause doctrine." Id. at 92. But the Supreme Court has

In the instant case, therefore, the "fundamental objective" of the dormant Commerce Clause to preserve a competitive national market is inapplicable, because Congress has already outlawed the national market for marijuana. Gen. Motors Corp., 519 U.S. at 299. While the majority assumes that the national marijuana market is sufficiently akin to legal interstate markets for our ordinary dormant Commerce Clause jurisprudence to apply, I believe that illegal markets are constitutionally different in kind, and thus disagree that the Commerce Clause protects the free-flowing operation of national markets that Congress has already made illegal through its Commerce Clause power. Nor should we expect Congress to speak out of both sides of its mouth on this issue, simultaneously illegalizing marijuana while affirmatively granting states the power to "burden interstate commerce 'in a matter which would otherwise not be permissible.'" New England Power Co. v. New Hampshire, 455 U.S. 331, 341 (1982) (quoting S. Pac. Co. v. Arizona, 325 U.S. 761, 769 (1945)). Yet the majority reads United Egg Producers and other precedent to compel this posture. My reluctance to join my colleagues in extending

---

certainly never indicated that it is a constitutionally cognizable harm under the dormant Commerce Clause to "adversely affect[]" out-of-state actors if their "unrepresented interest[]" consists solely in peddling illicit goods. Id. Further, as the majority itself concedes, the fear that protectionist legislation might instigate injurious interstate rivalries is significantly attenuated in the unusual context of illegal markets.

constitutional solicitude to protecting an illegal market is heightened if one were to imagine extending the same logic to relieve burdens on the illicit trade in other Schedule I controlled substances, such as heroin, fentanyl, or cocaine, or indeed most any other black market in goods or services which Congress has determined is harmful to the public interest. Nothing in our precedents asserts a "fundamental" constitutional interest in "preserving a national market for competition" in a market which Congress has lawfully proscribed. Gen. Motors Corp., 519 U.S. at 299.

To be sure, if Congress were to legalize marijuana, which it has not done via the passage of the Rohrabacher-Farr Amendment, I would join the majority in finding this legislation unconstitutional under the dormant Commerce Clause. But the dormant Commerce Clause does not provide the right to engage on equal footing in a federally illegal market, regardless of the evolving political and legal landscape of marijuana at the state level and Congress's implicit recognition that the CSA has not eradicated the marijuana market. See Original Investments, LLC v. Oklahoma, 542 F. Supp. 3d 1230, 1233 (W.D. Okla. 2021); see also Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City, 861 F.3d 1052, 1054-55 (10th Cir. 2017).[3] As such, appellees should

---

[3] The court's analysis in Original Investments, LLC that courts should not use their equitable powers to facilitate conduct

not be able to receive a constitutional remedy in federal court to protect the sale and distribution of a controlled substance which remains illegal under federal law. I respectfully

**DISSENT**.

---

that is illegal under federal law finds support in case law from our sister circuits. See Fourth Corner Credit Union, 861 F.3d at 1054-55; Cartlidge v. Rainey, 168 F.2d 841, 845 (5th Cir. 1948); see also Finch v. Treto, No. 22C1508, 2022 WL 2073572, at *13-15 (N.D. Ill. June 9, 2022) (acknowledging that most courts considering this issue "have not substantively addressed whether federal courts can award equitable relief related to state-sanctioned cannabis businesses").